## SYDNOR and others vs. PALMER and another.

*Adverse Possession—Deposition, commission to take, and execution thereof.*
*Practice. Statute of Limitations—Trusts.*

1. Where the return of commissioners to take testimony out of the state shows that the witnesses subscribed their names to their respective answers, and the certificate of the commissioners state the witnesses "were *duly sworn* before giving their evidence," it will be *presumed* that they knew the contents of their answers as written down, and were sworn "to speak the truth," according to the customary form of oath.

2. A rule entered as of course by a party to an action, for a commission to take testimony out of the State, should name one or more commissioners; and the commission should issue to the person or persons so named, unless the opposite party procures, on motion, an order of court that it be otherwise issued.

3. In a deed of land in trust, any description of the *cestuis que trust* is sufficient, from which the court and jury, aided by a knowledge of surrounding facts and circumstances, can with reasonable certainty identify the persons intended. So held in a case where the trust was passive, and the title vested by the statute in the beneficiaries.

4. In an action involving the title of persons claiming as such *cestuis que trust*, evidence is admissible to show the situation of the parties, their relation to each other and to the subject matter of the deed, and all circumstances leading to or attending its execution and delivery, for the purpose of explaining its meaning and applying it to the persons and subject-matter intended, where these are not fully and definitely ascertained by the words used.

5. The *cestuis que trust* need not be described by name in such instrument; and mistakes in the names may be shown and corrected by proof of extrinsic facts, or may be disregarded.

6. In an action by plaintiffs claiming as *cestuis que trust* under a deed of land from D. to M. H. "in trust for the use and benefit of ——, heirs-at-law of S. M. C., deceased, for whom the said M. H. is legal guardian," *held*, that it was proper to admit in evidence, (1.) A bond executed with sureties, by M. H. as guardian of plaintiffs, prior to said deed, which recites his appointment as such guardian by the county court of the county in which the land in question lies. (2.) Secondary evidence that letters of guardianship had issued to him, there being no record of his appointment in said court, and the letters of guardianship having been lost. (3.) The last will of said S. M. C. (of prior date to said deed) in which D., the grantor in said

Sydnor and others vs. Palmer and another.

deed, was named as executor, and from which it appears that plaintiffs were the parties beneficially · interested in the land described in said deed, and were the sole *legatees* of said testator. (4.) Accounts and reports presented to the probate court by D., under oath, showing that the whole equitable title to said land was in said testator at the time of his death, while the legal title was in D., and so continued until he executed the deed of trust in question. (5.) Testimony showing that plaintiffs and two other persons, children of two deceased sisters of said testator, would have been his sole heirs-at-law had he died intestate.

7. A bequest to the testator's "nieces and nephews, *children* of the late W. H. S.," *held*, not to include a *step-child* of said W. H. S., although she was also testator's niece, no reason being shown for departing from the usual meaning of the word "children," and no claim being made by such step-child or any one in privity with her.

8. Circumstances showing that D. *believed* M. H. to be the "legal guardian" of the plaintiffs might be sufficient to identify them as the *cestuis que trust* described in the deed, even if no valid appointment of such guardian were shown, and evidence thereof is admissible for that purpose.

9. It is competent for an executor who is required by the terms of the will to *retain* land for the benefit of infant devisees, or to *sell* it for their benefit when its use became unprofitable, to convey it directly to them, and if they accept the conveyance and ratify it after attaining their majority, a third party, claiming adversely to them, cannot be heard to object that the conveyance was void for want of a literal compliance with the will.

10. Where a grantor of land, whose deed is not shown to have contained any covenant of seizin or warranty, subsequently took tax deeds of the land, the title under them did not enure to the benefit of his grantees, and they cannot claim to have had possession under such tax deeds so that the statutory limitation applicable to such a possession would run in their favor.

11. It seems that where one of several tenants in common, being in possession and having acknowledged the title of his co-tenants, seeks to turn his occupancy into an *adverse* possession under an invalid or merely colorable claim of title to the whole estate, so as to acquire title to the whole under the statute of limitations, he must show when the knowledge of such adverse claim, or of his intentions to hold under it, was brought home to his co-tenants; and his possession will be regarded as adverse only from that time.

12. The only exception to the foregoing rule is, where the sole and uninterrupted possession and pernancy of the profits by one, tenant has

been so long continued as to justify the jury in finding knowledge and acquiescence in the other tenants.

13. It is a general rule that where one enters upon land under a recorded deed, which purports to give him a complete title to the whole land, his possession becomes *adverse* to all the world.

14. Evidence of possession adverse to the true owner must be clear and positive, and is to be construed strictly, and every presumption is to be made in favor of the true owner.

15. Such evidence must show positively and clearly a *continuous* occupancy; and where the facts testified to did not negative the idea that there might have been considerable interruptions of such occupancy, the jury were justified in finding against the party claiming under the statute.

16. Statutes which make a certain kind of possession effectual to change the title to land, should not be so construed as to include any case not fairly within the words.

17. *It seems* that the use and occupation of land for the purpose of digging mineral, or for other operations *beneath the surface*, and not connected with the ordinary use and cultivation of the soil, is not such a use and occupation as constitutes an adverse possession under subd. 3, sec. 7, chap. 138, R. S.

18. After verdict found in one county of the fifth judicial circuit of this state, it was not irregular to refuse a motion for a new trial and render final judgment in another county thereof, under ch. 143, laws of 1857. *Stephens v. Magor*, (25 Wis. 533) followed.

APPEAL from the Circuit Court for *La Fayette* County.

Action by plaintiffs, claiming title in fee to the undivided one-sixth part of certain mineral lands, to recover possession thereof from the defendants, who unlawfully withhold the same.

The action was commenced in January, 1867, and was originally brought against *Palmer*, alone, but the *Phœnix Lead Mining and Smelting Co.*, under whom *Palmer* held as tenant, was subsequently admitted as a party defendant on its own application.

The amended complaint, filed in December, 1868, alleged the title and right of possession of the plaintiffs, the unlawful withholding and total denial of their right by the defendant *Palmer* as tenant of the other defendant, and that the plaintiffs are respectively aged 24, 26 and 28 years, and are and ever have been residents of the state of Virginia.

The defendants answered separately, setting up substantially the same defenses, viz.: that the defendant *Palmer* was lawfully in possession as tenant of the *Phœnix Lead Mining and Smelting Co.*, and that he did not unlawfully withhold• possession of the premises described in the complaint from, or totally deny the rights of the plaintiffs; that the company was the owner of the premises in fee simple, and the plaintiffs had no title or right of possession at the commencement of the action; and that all ·right of action on the part of·the plaintiffs, or any of them, was barred by the statute of limitations; denying the other allega-tions of the complaint; the company also alleging that, if the plaintiffs had any right or interest in the estate, one Novella C. Blackwell was equally and jointly interested with them.

At the trial, it was admitted that on the 12th day of April, 1852, F. J. Dunn was seized in fee of the undivided one-sixth part of the premises described in the complaint, as tenant in common with the grantor of the *Mining and Smelting Co.*, and that said company was seized in fee simple of the remaining five-sixths, at the commencement of the action. The plaintiffs introduced in evidence a deed, dated April 12, 1852, from F. J. Dunn and wife, to Marvin Hollister, " in trust for the use and benefit of ——, heirs-at-law of Seneca M. Conway, deceased, for whom the said Marvin Hollister is legal guardian," (the place for the names of the beneficiaries being left blank), conveying the undivided one-sixth part of the premises in question, in fee simple, with the usual covenants of seizin, warranty, etc. Several depositions, taken in Virginia, were then offered and received in evidence, under defendants' objections that they were not certified as required by law and the rules of court, and for other reasons appearing on their face; by which it ap-peared that Seneca M. Conway died in Wisconsin; that he was never married, and left neither ancestor, nor issue, nor brother, nor sister; that the plaintiffs were the only children of Wm. H. Sydnor and Mary, his wife, who was a sister of Seneca M. Conway; and that Novella C. Blackwell, a daughter of·said Mary

by a former husband, was *still* living.   Each deposition recited that it was the deposition of " a witness produced, sworn, and examined on oath," and was signed by such witness; and the commissioner certified at the end that it was the deposition of a witness named, " who, being duly sworn before examination was taken before me," etc., and that said witness "subscribed his name in my presence."

A paper, purporting to be a guardian's bond, executed to to the plaintiffs by Marvin Hollister, March 12, 1852, which recited his appointment as their guardian by the county court for La Fayette county, Wisconsin, and is in the usual form of such bonds, and is indorsed as filed and approved by J. H. Knowlton, judge, was then introduced, with proof that there was no other paper on record in the office of the county judge relating to such guardianship.

The deposition of Judge Knowlton, proving the appointment of said Hollister as guardian for plaintiffs, and the issue of letters of guardianship to him, the filing and approval of said bond, and that it was the practice of the county court, in 1852, to deliver letters of guardianship to the person appointed, without recording, was then offered and received in evidence, the objection of the defendants that the commission was directed to and executed by the commissioner named by the plaintiffs alone, and not the commissioners named by the defendants, and objections to its admissibility in proof of the issuing or loss of the letters of guardianship, having been overruled.

Mr. Hollister testified that he was unable to find the letters of guardianship, and was positive that he never received them, but that he entered upon the duties of guardian, and received the deed of the premises in suit from Dunn, paying no consideration, and supposed it to be for the benefit of all the heirs of Conway, and held it for those who were his legatees and devisees, knowing no other heirs; and that he had conveyed the same to Moses M. Strong for the consideration of $500, which was paid to him, and was a full price for the land.

The will of Seneca M. Conway,. deceased, which had been admitted to probate in the La Fayette county court, on the 7th day of March, 1848, was then introduced; by the third clause of which the testator bequeathed to his " nieces and nephews, children of the late William H. Sydnor of the county of Northumberland and state of Virginia," all his property real, personal and mixed, in the territory of Wisconsin, giving the directions stated in the opinion of the court, as to the working of veins of lead ore in such lands, so long as profitable, for the benefit of the legatees, and their sale after they should cease to be profitable; and appointing Francis J. Dunn his executor as to such property.   A portion of the account of Dunn as executor, rendered March 10, 1852, and of his report as to the lead ore diggings, showing that he had retained the property in controversy and considered it of great value, and that it would take some time, perhaps eighteen months, to develop and prove its value,, was also read in evidence under defendant's objection; and the plaintiffs further proved the exclusive possession and occupation of the whole land described in the complaint, by the defendant *Palmer* for agricultural purposes, under a lease from the wife of Moses M. Strong, the right to mine being reserved to the lessor; that the plaintiffs had not demanded to be let into possession with him, but if they had, he would have refused it, without the consent of his lessor; and that Seneca M. Conway had, at the time of his death, an equitable interest in the land, of which F. J. Dunn had the legal title.

They also read in evidence a quit-claim deed of the land from Marvin Hollister and wife to them, dated August 14, 1866, and rested their case.

The defendants read in evidence the record of three tax deeds, covering the premises, given to the county of La Fayette, by the clerk of the board of supervisors of said county, in 1850, 1852 and 1853, all of which were conceded to be void on their face, but were admitted for the purpose of aiding the defendant's title by possession; also a quit-claim-deed from said county

to Moses M. Strong, dated March 6, 1856; a deed from Marvin Hollister to Moses M. Strong, of the undivided one-sixth of the premises, dated April 25, 1854; a deed from Strong and wife to the Western Wisconsin Mining Company of the entire estate in the land, dated June 19, 1854; a sheriff's deed of the same to W. T. Henry upon a sale on execution against that company, and a quit-claim deed from Henry to the wife of Strong; and proved the lease by her to *Palmer*, and the conveyance of the premises by her to the *Phœnix Lead Mining and Smelting Company*, subject to the lease. Moses M. Strong testified that from March 6, 1856, until September, 1862, the Western Wisconsin Mining Company was in the exclusive possession and occupancy of the land described in the complaint, a considerable portion of the time running a pump; that the company built a house thereon in 1858, which was occupied by tenants; that from September, 1862, to November, 1864, Mrs. Strong was in possession, part of the time by *Palmer* as tenant; that in November, 1864, Mrs. Strong conveyed to the *Phœnix Company*, and they had been in possession for mining purposes since January, 1864, and *Palmer* for agricultural purposes; that the defendant's possession was open, notorious and exclusive; that ever since the deed from Hollister to him, he and his grantees had been in possession, claiming and supposing they had the whole title; that he, as president and agent of both companies, had managed the affairs of both; and that neither of the plaintiffs had made demand to be let into possession with him, though he was willing to and had offered to admit them if they showed they had any title. He also testified that F. J. Dunn had the legal title to an undivided half of the land, and conveyed to himself an undivided one third of it; and that he knew of the character of the deed to Hollister when he took the conveyance from him. His testimony as to the acts of possession and use of the premises by himself and the mining company sufficiently appears in the opinion of the court.

The bill of exceptions is certified to contain all the evidence.

The court gave the jury the following among other instructions: "This action having been brought by the plaintiffs, claiming title to the premises described in the complaint as tenants in common, against the defendants, it is necessary that the plaintiffs, in addition to all other evidence, shall have proved on the trial of the cause, to the satisfaction of the jury, that the defendants actually ousted the plaintiffs, or did some other act amounting to a total denial of their rights; otherwise it is the duty of the jury to return a verdict for the defendants."

"The continual occupation of mineral ground for mining purposes is such possession as is contemplated by section 7, chap. 138, R. S." The deed from Dunn to Hollister "conveys the legal title to the heirs of Seneca M. Conway, deceased, of whom Marvin Hollister was the legal guardian, provided those persons can be ascertained."

"I do not think the guardian could sell the land without a license from the proper court."

"The plaintiffs in this action must satisfy you, first, that they are the heirs at law of Seneca M. Conway; and secondly, either that Marvin Hollister was their legal guardian, or if not, that both Francis J. Dunn and Marvin Hollister regarded the latter as the legal guardian of the plaintiffs." "It is sufficient on this point if the evidence satisfies you that both Mr. Dunn and Mr. Hollister regarded Mr. Hollister as the legal guardian of the plaintiffs, and that they are the persons designated as the grantees in the deed from Mr. Dunn.

"If you should find the plaintiffs to be the persons mentioned in the deed from Mr. Dunn, they are entitled to recover, (if no legal defense is established,) providing it is shown, not only that the defendants have been in the exclusive actual possession, but that they have actually ousted the plaintiffs or done some act amounting to an actual denial of their rights. Holding the exclusive possession by the defendants under a deed purporting to convey the whole title, denying the plaintiff's title, will be sufficient proof of ouster.

" The county of La Fayette, on the 6th of March, 1856, claiming this land by virtue of divers tax titles, conveyed the same to Moses M. Strong.   Although these tax title deeds may be and are invalid, yet an adverse possession under a void conveyance, in good faith, for ten years, will constitute a good defense as against persons of full age.

" If the defendants, or those under whom they claim, have been in the actual possession of the land, claiming and holding it adversely for ten years immediately preceding the commencement of this action, the plaintiffs cannot recover, if either one of them was twenty-six years of age when this action was commenced.

" Such an action as this, in case of an adverse possession of ten years under a written instrument, must be commenced not longer than five years after the plaintiff has arrived at the age of twenty-one years.

" If one of the plaintiffs is barred by the statute of limitations in the action, his co-plaintiffs cannot recover, for the undivided interest would be different from that claimed in the complaint."

The court then read to the jury sections 6, 7 and 10 of chap. 138, R. S., and refused to charge the propositions asked by the defendants, which were substantially the same as contended for by them on the argument in this court.   The defendants duly excepted to the greater portion of said charge.

The action was tried at the June term, 1870, and a verdict rendered for the plaintiffs, and the defendants moved at the same term for a new trial, and the motion was argued and submitted to the court, but not disposed of before the adjournment of the term.   At the September term, 1870, of the circuit court for the county of Grant, in the same judicial circuit, an order was made, on motion of plaintiffs and without notice to defendants, denying such motion, and a judgment ordered in accordance with the verdict.

From the judgment entered in the circuit court for La Fayette county, under such order, the defendants appealed.

*Finches, Lynde & Miller*, for appellants, contended, 1. That the deed from Dunn vested the legal estate in Hollister in his own right, and not in trust; 2. That, if it created a trust, it was an express trust, and vested the legal estate in Hollister, and not in the heirs of Conway, citing Story's Eq. Jur. § 980; *Morice v. The Bishop of Durham*, 10 Vos., 537; *Brown v. Combs*, 5 Dutcher (29 N. J. Law R.), 36; *Selden's Appeal*, 31 Conn., 552; *Eldridge v. See Yupp Co.*, 17 Cal., 44; 1 Hilliard on Real Prop., 282; *Goodrich v. City of Milwaukee*, 24 Wis., 422; that it must vest in the trustee because the deed does not designate, with sufficient definiteness, any person or persons as *cestuis que trust*, who can take the legal estate; 3. That the plaintiffs could not take any estate by virtue of the deed from Dunn to Hollister, unless they proved to the satisfaction of the jury both that they were the heirs of Conway, and that Hollister was their legal guardian; 4. That the depositions first introduced by plaintiffs were objectionable because they did not show whether the witnesses were sworn to state the *truth* or something else, and the certificates do not show that the depositions were read to or by the witnesses, or that they knew their contents, citing, *Lightfoot v. Cole*, 1 Wis., 26; *Burroughs v. Booth*, 1 Chip. (Vt.), 106; *Winooski Turnpike Co. v. Ridley*, 8 Vt., 404; *Bell v. Morrison*, id., 355; and that the other deposition was objectionable because the commission was addressed to one commissioner alone, and not to those named by the defendants, and because a proper foundation for secondary evidence of the loss of letters of guardianship had not been laid, and the issuing thereof could not be proved by parol; 5. That if Conway's heirs take the estate without regard to Hollister's being their legal guardian, the children of his other sisters would take with the plaintiffs, or at least, Novella C. Blackwell, being his *neice* and *step-child* of W. H. Sydnor, would take with them; 6. That it was error to permit the fact that the plaintiffs were the *cestuis que trust* in the deed to be established by parol evidence tending to show that the grantor and the trustee regarded them

as such, or to admit the accounts and statements of Dunn for that purpose, citing *Balston v. Telfair*, 2 Devereaux Eq. Cases (N. C.), 255; *White v. Williams*, 3 Vesey and B., 72; *Langham v. Sanford*, 2 Merivale, 17; *S. C.* before Master of the Rolls, 17 Ves., 436; *Love v. Gage*, 8 Beav., 472; *Orton v. Harvey*, 23 Wis., 99; *Callahan v. Judd*, id., 343; *Cole v. Clark*, 4 Chand., 29; *Same v. Same*, 3 Wis., 323; *Peet v. Ch. and N. W. Ry. Co.*, 20 Wis., 594; *Plato v. Roe*, 14 id., 453; *Sigerson v. Cushing*, 14 id., 527; *Sweet v. Mitchell*, 15 id., 641; *Erwin v. Saunders*, 1 Cowen, 249; *Whitman v. Weston*, 30 Me., 285; *United States v. Munroe*, 5 Mason, 572; 7. That if Hollister acquired any title by such deed, it was in his character as trustee, and not as guardian; 8. That the court erred in its instructions as to what constitutes a disseizin or ouster; 9. That it erred in instructing the jury that an adverse possession of ten years, in good faith, under the tax deeds, would be a good defense, when such possession for three years would be sufficient, citing *Edgerton v. Bird*, 6 Wis., 527; *Sprecker v. Wakely*, 11 id., 432; *Lindsay v. Fay*, 28, id., 177; 10. That the motion for a new trial should have been granted, and that the court had no jurisdiction to decide the motion in the county of Grant; 11. That the court had no jurisdiction to render final judgment in Grant county, nor at any other time than during a term of court, citing *Townsley v. Morehead*, 9 Iowa, 565; *Peabody v. Phelps*, 7 Cal., 53; *Wicks v. Ludwig*, 9 Cal., 173; *Holmes v. Lewis & Bates*, 2 Wis., 83; *Aymar v. Chace*, 12 Barb., 301; *Hogeboom v. Genit*, 6 Johns., 325; *Thorpe v. Corwin*, 1 Spencer (N. J.), 311; *Sheppar v. Wilson*, 6 How. (U. S.), 260.

*W. P. Lynde*, on same side, argued that Dunn, holding the legal title, upon certain special trusts directed by the will, could not sell until the happening of the event, which, under the will, authorized a sale, citing Tiffany & Bullard's Law of Trusts and Trustees, p. 766; and that, it not having happened, the deed to Hollister was absolutely void, and consequently the plaintiffs could derive no title through him; that the ten

years' adverse possession of the plaintiffs was established by the evidence of Strong; and that more than five years had elapsed, after at least one of the plaintiffs became of age, before the action was commenced, and consequently his co-plaintiffs could not recover in this action; and that, however defective the tax deeds might be, the plaintiff's right of action was barred in three years after the recording of the deeds, citing *Hill v. Kricke*, 11 Wis., 442; *Knox v. Cleveland*, 13 id., 245; *Dean v. Early*, 15 id., 100; *Parish v. Eager*, 15 id., 532; *Jones v. Collins*, 16 id., 594; *Smith v. Cleveland*, 17 id., 556; *Whitney v. Marshall*, 17 id., 174; *Gunnison v. Hœhne*, 18 id., 268; *Wood bury v. Shackleford*, 19 id., 55; *Lain v. Shepardson*, 18 id., 59; *Swain v. Comstock*, 18 id., 463; *Lindsay v. Fay*, 25 id., 460.

*P. A. Orton, Jr.*, for respondents, contended that the deed from Dunn to Hollister did not create such an express trust as was recognized by our statute (R. S. 1849, chap. 57, sec. 11), but it created a mere passive trust, and under that statute the legal title, vested, not in the trustee, but in the *cestuis que trust*, citing *White v. Fitzgerald*, 19 Wis., 480; that the *cestuis que trust* need not be named in the deed, if sufficiently described to identify them, citing 2 Washburn, Real Prop., 565; that this deed must be construed as vesting the legal title, not in all the heirs of Conway, but only in those of whom Hollister was legal guardian, citing 2 Parsons on Con., 16, 17; that the commission to take the deposition of Knowlton was properly issued to the commissioner named in the rule entered, and if the defendants wished to have other commissioners appointed it was their duty to move the court to modify the rule: that the existence and loss of the record of letters of guardianship having been shown, their contents might be proved by parol, citing 1 Greenl. Ev., §§ 509–558; *Stockbridge v. West Stockbridge*, 12 Mass., 400; that if Hollister was not the legal guardian of the plaintiffs, yet the proofs show that the deed was intended to vest the legal title in them, and there was a latent ambiguity which might be explained by parol, citing *Staack v. Sigelkow*,

19 Wis., 234; *Miller v. Travers*, 8 Bing. (E. C. L.), 244; that if mis-described as the wards of Hollister, but shown to be known as such, they would take under the deed, citing 2 Wash. Real Prop., 565 ; that the statute of limitations would run only from the time when defendants took exclusive possession of the whole premises, denying plaintiff's right, citing *Wright v. Sperry*, 21 Wis., 331; *Clapp v. Bromagham*, 9 Cow., 555; that the defendants, having expressly denied that they had ousted the plaintiffs or denied their rights, cannot claim that they are barred by adverse possession or the statute of limitations; that the jury could have found their verdict for the plaintiffs only on the ground that the defendants had not held adverse possession for ten years; that no possession anterior to Hollister's deed to Strong, April 25, 1854, would avail the defendants ; that the acts of possession testified to by Strong, between 1854 and 1858, did not constitute an adverse possession as against co-tenants, under sec. 7, chap. 138, R. S., citing Tyler on Ejectment, 882 ; that the mere record of a void tax deed does not constitute constructive possession, but so long as neither party is in possession, the statute runs in favor of the former owner; that to become a bar, the three years actual possession under a void tax deed, must commence immediately after it was recorded; that no possession was taken under any of the tax deeds to the county until after the county sold to Strong, some eight months before a suit under the last one would be barred, not soon enough to give him the benefit of the bar, even if he, being a tenant in common with the plaintiffs and bound to pay the taxes, could take advantage of it against them, they being at the time infants and residents of another state; that the deed from the clerk of the board of supervisors to Strong, conveyed nothing, not even color of title, no authority from the board to convey being shown, citing *Woodman v. Clark*, 21 Wis., 355 ; that the jury had found no actual possession adverse to the plaintiffs until after the limitation on the tax deeds had run in their favor; and that the defendants, having asked

no instruction as to the three years limitation, could not except to the failure of the court to instruct on that point, citing *Graves v. The State*, 12 Wis., 591; *Bogert v. Phelps*, 14 id., 88; *Tomlinson v. Wallace*, 16 id., 224.

DIXON, C. J. The depositions of the witnesses examined abroad were all admissible. The objections to those of the Virginia witnesses were, that, though they showed the witnesses were sworn, they did not show they were sworn to speak *the truth*, and the certificates did not state that the depositions were read to or by the witnesses, or that they knew the contents of them. Rule 61, Circuit Court Rules of 1849, prescribes the mode of taking such depositions, or of executing the commission issued for that purpose, and seems to have been strictly and fully complied with. The language of the rule in these particulars is: "Every interrogatory, direct and cross, shall be propounded to each witness, and his answer thereto shall be taken and returned with the commission. Each witness shall subscribe his name at the end of the answers to the interrogatories, and the commissioners shall subscribe their names at the foot of each page of the testimony, and shall certify in their return that the witnesses were *duly sworn* or affirmed before giving their evidence." It is enough that these requirements appear to have been complied with, to authorize the admission of the depositions. It appearing that the witnesses answered the several interrogatories, and that they were "duly sworn," the presumption is that they knew the contents, and were sworn to speak the truth, according to the form of oath usually administered, until the contrary is shown. Rule 65 declares, that "in all cases where commissions have been issued, and testimony taken in accordance with these rules, the evidence may be read on the trial of the cause or the hearing of any proceeding wherein they were taken, with the same effect as if the witnesses examined had been produced on the trial or hearing."

The objection to the deposition of the witness examined at

Chicago was, that the commission was issued to the one commissioner named in the rule entered by the plaintiffs, and not jointly to him and the other two persons nominated by the defendants as commissioners to act with him. The cross-interrogatories filed and served by the defendants were preceded by a statement that they objected to the person named in the rule acting as sole commissioner, and they thereby nominated two other persons as commissioners to act with him. The attorney for the plaintiffs disregarded the objection and nomination thus made, and justifies his action on the ground that it was the duty of the defendant's attorneys, if they desired any change in the commission, or that the two other persons named by them be also appointed, to have moved the court for an order vacating or modifying the rule already entered. The rule that a commission issue, entered as of course in the common rule book kept by the clerk under rule 59 of the circuit court rules, must undoubtedly name the commissioner to whom the commission is to be directed. This appears from the language of rule 60, which provides that "the commission shall be directed to the commissioners named in the rule, and be addressed to them jointly and severally." We are satisfied of the correctness of the course pursued by the attorney for the plaintiffs, and that the commission was properly directed to the commissioner named in the rule, in the absence of a motion and order of the court or judge that it be otherwise issued.

The trust expressed in the deed from Francis J. Dunn and wife to Marvin Hollister, executed and acknowledged on the 12th day of April, 1852, was clearly a passive one; and that being so, no estate or interest, legal or equitable, vested in the supposed trustee, Hollister; but the legal title and absolute right of property passed to and vested in the *cestuis que trust* under the operation of the statute, provided the *cestuis que trust* were sufficiently described in, or their identity and the intention of the grantors can with reasonable certainty be ascertained from the words of the deed. R. S., 1849, ch. 57, secs. 3

and 5,—the same as secs. 3 and 5, ch. 84, R. S., 1858; *Goodrich v. The City of Milwaukee*, 24 Wis., 429, 430; *Riehl v. Bingenheimer*, 28 id., 84. The conveyance in question was to Marvin Hollister "in trust for the use and benefit of ——, heirs-at-law of Seneca M. Conway, deceased, for whom the said Marvin Hollister is legal guardian, party of the second part." One of the principal points in controversy on the trial below, was as to the sufficiency of this description of the persons beneficially interested, and whether the plaintiffs had shown themselves to be such persons. It is well settled that any description of parties in an instrument of this kind is sufficient, from which the court and jury, aided by a knowledge of surrounding facts and circumstances, are able to say with reasonable certainty that some and what particular persons were intended. It is not necessary that the parties should be described by their names, in order to give effect to the instrument, but any other description by which they may be identified will serve as well; and even mistakes in the names may be shown, and corrected or disregarded, by proof of extrinsic facts and circumstances demonstrating the falsity. It is always competent and proper to receive proof of the situation of the parties, and of their relations to each other and to the subject of the contract or conveyance, and of all circumstances leading to and attending its execution and delivery, for the purpose of explaining its meaning and applying it to the persons or subject matter intended, where those are doubtful on the face of the instrument, or not fully and definitely ascertained by the words used. The authorities to these propositions are numerous, and we refer only to *Staak v. Sigelkow*, 12 Wis., 239 to 243; and *Ganson v. Madigan*, 15 id., 153–155, and authorities there cited.

One item of proof offered and received in this case, by way of identifying the plaintiffs as the *cestuis que trust* intended, was the bond of Hollister, with sureties, executed on the 12th March, 1852, reciting that he had been on that day appointed guardian of the plaintiffs by the county court of La Fayette

county, in which county the land in suit was situated. This was followed by secondary evidence of his appointment as guardian, or such evidence tending to show it, and that letters of guardianship were issued to him, there being no record of the appointment in the county court, and the letters of guardianship having been lost.

Another item of proof offered and received for the same purpose was the last will and testament of Seneca M. Conway, deceased, who died testate in La Fayette county in the month of February, 1848; which will was admitted to probate in the county court of said county, on the 7th day of March, 1848. Francis J. Dunn, the grantor in the deed, was the executor nominated and appointed in the will, and to whom letters testamentary subsequently issued. It appeared from the will, a recital of the particular provisions of which is unnecessary here, that the plaintiffs, as legatees named in it under the description of "my nieces and nephew, children of the late William H. Sydnor, of the county of Northumberland in the state of Virginia," were the parties beneficially interested in the land in controversy, which was spoken of in the will as "consisting of parts of veins of lead ore, commonly called lead ore diggings." It furthermore appeared, from an account of receipts and disbursements rendered by Mr. Dunn, as executor, to the county court on the 10th day of March, 1852, and from a statement or report made by him at the same time, under oath, of the condition of the estate and of his management and transactions in connection therewith, and in execution of his trust, both of which were likewise offered and received in evidence, that the entire equitable interest in the land was in the testator, Conway, at the time of his decease, but that the legal title was at that time in Mr. Dunn, who subsequently became executor, and so continued until the above statement or report was made, and until he executed the conveyance in trust to Mr. Hollister on the 12th of April following.

It was likewise shown by the depositions of witnesses, that

the testator, Conway, was never married; that he died leaving neither ancestor nor issue surviving him; and that the plaintiffs and two other persons, his nephews and nieces, children of two of his deceased sisters, were his heirs-at-law. He left no surviving brother or sister, half-brother or half-sister.

Evidence of these facts and circumstances, or tending to prove them, was admitted, and properly so, to explain the situation of the parties and their relations to each other and the subject matter, and so to ascertain and give effect, if possible, to the language of the instrument and the intention of the parties to it, which were otherwise unintelligible to the court and jury. It was evidence proper to point out and show who were the *cestuis que trust* intended; and the jury, under the instructions of the court, found the plaintiffs were the persons answering to the description contained in the deed. And this conclusion of the jury is quite satisfactory to us. Indeed, we do not see how, under the evidence, they could have found differently. It was shown that the plaintiffs were "heirs-at-law of Seneca M. Conway, deceased." It was shown that they were the heirs "for whom the said Marvin Hollister was legal guardian," or at least supposed to have been at the time the deed was executed. The latter, as well as the former, are descriptive words in the deed; and neither could be rejected in determining who the *cestuis que trust* were. Both descriptions were fulfilled in the persons of the plaintiffs, whilst neither of the other heirs came within the latter. And this conclusion, derived from the language of the deed, is greatly strengthened by a consideration of the provisions of the will, and of Mr. Dunn's relations to it and the estate, and of the obligations which rested upon him with respect to these plaintiffs, as executor and trustee. He was about to surrender his charge as executor and trustee, and to leave the state, not to return, and it seems morally certain that he could not have intended to convey the land to the use or for the benefit of any other persons than the legatees, or parties beneficially interested in it under the will, who are the plaintiffs in

this action.   These considerations give such force to the argument, that the words "heirs-at-law" were used by mistake for the word "legatees," which was intended ; but whether this was so or not was immaterial, since the construction must be the same in either case.

It is argued that in the bequest in the will of all his property to his "nieces and nephew, children of the late William H. Sydnor," the word "*children*" must be intended to have meant the *step-child*, Novella C. Blackwell, a daughter of Mrs. Sydnor by a former husband, whose relationship to the testator by consanguinity, was the same as that of the plaintiffs.   The court below rejected this construction, and we think properly. No facts were shown or reason assigned, other than the relationship of Novella C. Blackwell, why the ordinary and generally received meaning of the word should not be adhered to, or why the testator did not so intend.   Such relationship may show why she might have been remembered by the testator, and properly regarded as one of the objects of his bounty ; but it will hardly suffice to change or extend the meaning and application of a word in common use, the ordinary signification of which must have been familiar to the testator.    It must be supposed that he used the word in its usual and familiar sense, intending that the same meaning should be attached to it when read by others.   If he had intended the step-daughter as well, then why did he not say "my nieces and nephew, children of my sister, the late Mrs. Sydnor, wife of the late William H. Sydnor," or use other equivalent words, which would have made his meaning plain ?   We know not his motive, or why he should have manifested any partiality for the children of his sister's second marriage, nor is it material to inquire.   It may have been that Novella C. Blackwell was not without a competency or more, as the heir of her father, the first husband ; or there may have existed some other reason in the mind of the testator for withholding from her any share in his estate.   But whatever his reasons may have been, they are im-

material, so long as the words of the will are such as to leave no doubt of the testator's intention. Nor are we to forget that the objection does not come from Novella C. Blackwell, now Mrs. Hudnall, who apparently acquiesces in the construction of the will claimed by the plaintiffs. It is not made in her behalf nor in her interest, but by strangers, whose only motive is to defeat the entire estate or right in the property passed by the will.

Another objection was, that it was not shown that Marvin Hollister was the legal guardian of the plaintiffs; and upon this point the court below charged the jury, if they should find he was not, yet it would be sufficient if the plaintiffs satisfied them "that both Francis J. Dunn and Marvin Hollister regarded the latter as the legal guardian of the plaintiffs." This instruction was clearly correct. It was enough that Mr. Dunn, the grantor, so regarded Mr. Hollister, for what Mr. Dunn, although he may have been mistaken, actually thought and expressed in words in the deed, significant of his intent as to the persons of the *cestuis que trust*, as truly indicated who those persons were, as if the fact had been as he supposed it to be. It was immaterial, therefore, whether Mr. Hollister was in reality legal guardian or not, if only Mr. Dunn so believed him to be, and acted on that belief in designating or describing the persons for whose benefit the conveyance was made.

Another objection argued at great length by counsel for the defendants in this court is, that Mr. Dunn violated the trust reposed in him, and exceeded the powers conferred upon him by the will, in attempting to convey the land to Mr. Hollister or any one else, at the time and in the manner he did; and consequently that the deed was absolutely void, and no title passed to or vested in Mr. Hollister or the plaintiffs. It is conceded that Mr. Hollister paid Mr. Dunn nothing for the land; that he did not buy, nor Mr. Dunn sell the same to him; and the argument is based upon this fact, and upon a statement of Mr. Dunn, contained in the report made by him to the county

court shortly before the conveyance, that, according to the trust confided in him and the directions of the testator in his will, the time had not yet arrived when he was authorized to sell the land. It also proceeds upon the provisions of the will referred to by Mr. Dunn, and which were as follows: " And it is my will and desire, that the property of which I die seized, in the territory of Wisconsin, consisting of veins of lead ore, commonly called lead ore diggings, be retained and worked for the benefit of my legatees aforesaid, so long as it may be profitable and pecuniarily beneficial to the interest in the same bequeathed to my nephew and nieces aforesaid ; but when the same ceases to be profitable and beneficial as aforesaid, it is my wish and desire that the same be sold for the best price or sum of money that the same will bring, and that the money arising from such sale or sales is hereby willed to my nephew and nieces aforesaid." It is needless to state the particulars of Mr. Dunn's report; for, conceding all that is claimed by counsel with respect to the nature of the trust, and Mr. Dunn's want of authority to transfer it, or to convey the land to any other person, we still think it was competent for him, with the assent of the plaintiffs, or subject to their future ratification, to make the conveyance directly to them, which was the effect of the deed. The plaintiffs were the parties solely interested in the working of the mines and in the proceeds of the sale of the land; and it certainly cannot be contended that it was incompetent for the trustee and executor to convey the land to them, with their assent. If they are satisfied to take the land and discharge the trustee and executor, as they do by accepting it, who else shall object? No other person has any interest or right to interfere in the transaction. A stranger cannot interfere, and ask the court to set aside the conveyance or declare it a nullity. It must always be in the power of the trustee and *cestuis que trust*, or parties beneficially interested, under such circumstances, thus to deal with each other with respect to the trust estate. The plaintiffs having attained their majority, and being under

no disability, seek to ratify, and have ratified, the conveyance to themselves; and it is not for the defendants to deny them the privilege, or object to their doing so.

The question of the statute of limitations upon the tax deeds, we regard as altogether out of the case. No copies of those deeds are set out in the record or contained in the bill of exceptions; but it was admitted on the trial, at the time they were offered, that they were void and conveyed no title. They were offered and received in evidence "for the only purpose of aiding the defendants' title by possession." It does not appear, however, that any possession was ever had or held by the defendants under those deeds. They were executed to the county of La Fayette, respectively, in the years 1850, 1852 and 1853; and the county released and quit-claimed to Mr. Strong in March, 1856; and there the supposed chain of title under them ended. Mr. Strong thereafter made no conveyance to the Western Wisconsin Mining Company, or any one else in the line of the defendants' grantors. In March, 1856, the Western Wisconsin Mining Company was, according to the testimony of Mr. Strong, in the possession and occupancy of the land, claiming title to the whole of it, and had been since the conveyance from himself and wife to that company on the 19th of June, 1854. The latter conveyance is not set forth in the record, nor are its nature or contents shown. It does not appear that it was a deed with covenants of seizin and warranty, so that the supposed title acquired by Mr. Strong from the county would have inured for the benefit and use of the company, if indeed the doctrine of inurement would be applicable to such a case. The facts present, therefore, no question upon a possession taken and held adversely under a void tax deed, and no question upon the statutes of limitation. Mr. Strong, the grantee and claimant under the tax deeds, has, according to his own statement in evidence, never been in possession, asserting or claiming title under them or by color thereof; nor has any other person been

in possession under or for him, or asserting or claiming through him or in his behalf, by virtue of the same tax deeds.

The chief remaining question on the trial below related to the running of the statute of limitations in support of the title claimed by the defendants under the deed from Mr. Hollister to Mr. Strong, which was made and delivered on the 25th day of April, 1854. That statute is section 6, chapter 138, R. S., which creates a limitation of ten years, and bars the action of the owner after that period has elapsed, "whenever it shall appear that the occupant, or those under whom he claims, entered into the possession of any premises under claim of title, exclusive of any other right, founding such claim upon some written instrument, as being a conveyance of the premises in question, or upon the judgment of some competent court; and that there has been a *continual* occupation and possession of the premises included in such instrument or judgment, or of some part of said premises under such claim, for ten years." The same section declares that "the premises so included, shall be deemed to have been held adversely," except when they are divided into lots, when the possession of one lot shall not be deemed the possession of any other. It would seem from the testimony of Mr. Strong, that he was in possession of the premises, having or claiming title to an undivided portion of them as tenant in common with the other owners, at and prior to the time he received the conveyance from Mr. Hollister. He spoke of the legal title to an undivided half of the land having been in Mr. Dunn, and stated in his testimony that he purchased and took a deed from Mr. Dunn for an undivided third, which was probably before Mr. Dunn removed to California, in 1852. He also stated that he occupied, with his employes, a log house which was on the land, in 1853. The evidence upon the point, it must be admitted, is not very clear; but if Mr. Strong was in possession at that time, claiming an undivided interest in the land as tenant in common with the other owners, it may be regarded as very

doubtful whether he could purchase or take any *merely colorable* title or conveyance of the shares of his co-tenants, and then claim adversely to them, so as to set the statute of limitation to running in his favor, until he had given them actual notice of such claim.

The rule of law in such case very clearly appears to be, that where one tenant in possession, having once acknowledged the right or title of the other tenants, seeks to oust or dispossess them, and to turn his occupancy into an adverse possession or enjoyment under an invalid or merely colorable claim of title to the whole, and so as to acquire the title of the entire estate by lapse of time under the statute of limitation, he must show when knowledge of such adverse claim, or of his intention so to hold, was brought home to the other tenants; for, from that time only will his possession be regarded as adverse. *Willison v. Watkins*, 3 Peters, 43 and *Whaley v. Whaley*, 1 Spears, 225, are leading cases in this country upon this subject. See also *Lapert v. Todd*, 32 New Jersey Law (3 Vroom), 124; 3 Washburne on Real Property (3d ed.), 127 to 129; and Tyler on Ejectment and Adverse Enjoyment, 882, and authorities cited. Such is always the rule, unless the exclusive use and enjoyment or sole and uninterrupted possession and pernancy of the profits by one tenant in common, have been so long continued as to give rise to the presumption of, or justify the jury in finding, knowledge and acquiescence on the part of the other tenants for the period of time prescribed by the statute. 3 N. H., 51; Cowp., 217; 1 Caines, 83; 6 Mass., 229; 10 Mass., 464; 3 Allen, 354; 21 Ala., 156. The cases of tenants in common, themselves holding or claiming by a defective or insufficient title, have been regarded as resting on different principles. It has been held, as between such, that one of them may, under some circumstances at least, acquire and hold for his own exclusive benefit, an outstanding paramount title. See *Frentz v. Klotsch*, 28 Wis., 312, and cases there cited.

But it is unnecessary to pursue this inquiry further as to the

character of Mr. Strong's possession, since he, so soon after the conveyance to him by Hollister, conveyed, or professed to convey, the entire estate in the land to the corporation known as the Western Wisconsin Mining Company. His deed to that corporation was dated and recorded on the 22d day of June, 1854. It purported to convey and give a complete title of the whole land to the mining company; and as the company was under no disability, as tenant in common or otherwise, to claim and hold adversely to any former claimant or owner in part or in whole of the premises, without causing notice to be given to such claimant or owner, it follows that the possession of the company, whatever it was, and of those claiming under it, must henceforth have been regarded as entirely and unconditionally adverse. It may be said to be a general rule, that, if one enters under color of title, he is presumed to enter claiming according to the extent of his title. Where one enters upon land under a recorded deed, which purports to give him a complete title, his possession becomes *adverse* to all the world. *Stevens v. Brooks*, 24 Wis., 326, and cases cited; and especially *Jackson v. Smith*, 13 Johns., 406.

The question of adverse possession and of the bar of the statute in this case, therefore, turns on the nature and extent of the occupancy, or the manner in which the premises were held and used by the Western Wisconsin Mining Company, and those claiming under it, after the 22d day of June, 1854. The question may in fact be said to turn upon the nature and extent of the occupancy by the mining company between the date of the deed to it, and the month of January or February, 1858, at which last date, Mr. Strong testified, the company erected a house on the land, and put in a pump to exhaust water from the mines. Between those dates, according to the testimony of Mr. Strong (and his is the only testimony) the land was only occupied by mining tenants, under verbal leases, who engaged in working out old "leads," and paid tribute to the company in proportion to the quantity of lead ore ob-

tained by them. There were, during that time, no buildings or structures of any kind upon the land, and the same was wholly uninclosed by fences, and uncultivated, "except the gardens of mining tenants, some of whom erected stone fences for little garden patches." Mr. Strong also testified that there "might have been one or two and sometimes three tenants of this sort on at one time, before 1858." He did not testify that the premises were continuously so occupied. It is also true that Mr. Strong testified on his direct examination, that "from the time of the execution of the deed from the county to myself, dated March 6, 1856, until September, 1862, the Western Wisconsin Mining Company, was in the exclusive possession and occupancy of the land described in the complaint, a considerable portion of the time running a pump." And he likewise further testified: "I think, from January, 1864, the *Phœnix Lead Mining and Smelting Company* have been in possession for mining purposes, and *Palmer* for agricultural purposes. The possession of the defendants was open, notorious and exclusive. Ever since the deed from Hollister to me, I and my grantees have been in possession, claimed, and supposed we had, the whole title." The latter extracts are given because relied upon by counsel for the defendants as showing a continuous adverse possession from June, 1854. It is obvious that they are but statements of the opinion or conclusion of the witness from his knowledge of the facts as to the character and extent of the possession, and not a statement of the facts themselves, which the nature of the inquiry or the subject under investigation demanded, and which alone could enable the court and jury properly to solve and determine the question. The facts with regard to the possession from 1854 to 1858, as shown by the same witness were as above stated.

· And first we observe of these facts, that it did not appear from them that the occupancy, such as it was, was *continual*. The words of the statute above quoted are, "a continual occupation and possession." Evidence of adverse possession is

always to be construed strictly, and every presumption is to be made in favor of the true owner. Such possession is not to be made out by inference, but by clear and positive proof. Such is the language of the authorities, and the rule is well settled. 37 N. H., 367; 13 id., 485; 3 id., 26, 50; 10 id., 402; 9 Johns., 167; 1 id., 157; 8 id., 220; 12 id., 367; 10 Mass., 146; 4 id., 418; 14 Pick., 228; 3 Greenl., 131. And the same principle governs wherever adverse user or enjoyment is relied upon as the foundation of title, or any right claimed against the party otherwise shown to be the owner, 23 Wis., 555, and cases there cited; *Kirk v. Smith*, 9 Wheat., 288.

The burden of establishing the kind of possession required by the statute, was upon the defendants; and this they must have shown by clear and positive proof, 3 Washb., on Real Prop., 123, 127. The testimony failed to do so. It did not show that the occupancy by the mining tenants was continual and uninterrupted. For aught that appeared or was clearly and positively proved, as the rule requires, there may have been considerable interruptions in such occupancy—times when for weeks or months, perhaps, no tenant was working the mines or otherwise occupying or possessing, 3 Washb., *supra*, 123, 126. The proof did not demonstrate to the contrary of this; and the plaintiffs, as the true and lawful owners, were entitled to the benefit of the presumption.

The requisites of the possession in other respects, or facts necessary to make it adverse, are defined by the next succeeding or seventh section of the same statute, as follows: "For the purpose of constituting an adverse possession by any person claiming a title founded upon some written instrument or some judgment, land shall be deemed to have been possessed and occupied in the following cases:

"1. Where it has been usually cultivated and improved.

"2. Where it has been protected by a substantial enclosure.

"3. Where, although not enclosed, it has been used for sup-

ply of fuel, or of fencing timber, for the purpose of husbandry, or the ordinary use of the occupant.

"4. Where a known farm or a single lot has been partly improved, the portion of such lot which may have been left not cleared, or included according to the usual course and custom of the adjoining country, shall be deemed to have been occupied for the same length of time as the part improved or cultivated."

Both sections of the statute were read to the jury as part of the charge; and in addition the jury were instructed, at the request of the defendants, that the continued occupation of mineral ground for mining purposes was such possession as is contemplated by the latter section. The correctness of the latter instruction is matter of grave doubt in the judgment of this court. Statutes of this nature, which operate in restraint of the true title, or to make a certain kind of possession effectual for that purpose, if they are not to be construed strictly, yet ought not to be construed so liberally as to include within them any case not fairly within the words. *The State ex rel. Wolff v. The Board of Supervisors of Sheboygan County,* (*ante,* p. 97). The courts have no power of addition or amendment, by which they can extend the operation of a statute, or adapt it to cases not provided for. The party whose title is to be destroyed or remedy barred, may properly stand on the letter of the statute, and insist upon a strict compliance with its conditions. We fail to discover any thing in the language of this statute by which it can be adapted to such a case. Perhaps mining in land for coal to supply fuel for the ordinary use of the occupant would fall within the third subdivision, the meaning of which obviously is, that the fuel or fencing supplied from unenclosed land must be for the purpose of husbandry or the ordinary use of the occupant. It seems clear, therefore, that all the provisions of the statute relate and are intended to apply only to the use and occupation of land for the purposes of husbandry, and that its use or occupation for the purpose of

digging mineral, or other works and operations beneath the surface, and not connected with agriculture or the ordinary use and cultivation of the soil, is not included.    But it may be said that these observations are unnecessary ; and so in strictness they seem to be, since, notwithstanding the instruction, the jury found there had been no adverse possession for the period of ten years before the commencement of the action.

The verdict must have been on the ground above shown, that there was no sufficient proof of continued occupation, either for mining or any other purpose, during the period from 1854 to 1858; and with that conclusion we are quite satisfied. The clear and positive evidence required by law was not given.

Another objection is, that the court erred in its instruction as to what constituted a disseizin or ouster sufficient to enable the plaintiffs to maintain their action of ejectment.    The correctness of the instruction is shown by *Wilkinson v. Filby*, 24 Wis., 441.

The objection that the court could not decide the motion for a new trial, nor render final judgment, in the county of Grant, is also untenable.    *Stevens v. Mayor*, 25 Wis., 533.

It appears, therefore, from an examination of the entire case and all the exceptions taken, that there was no error in the trial and proceedings, and that the verdict and judgment should not be disturbed.

*By the Court* — The judgment is affirmed.